FILED

2014 Aug-19  PM 02:50
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **MARY CAMPBELL,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **vs.** | } | **CASE NO. 2:12-CV-3455-SLB** |
| | } | |
| **NORTHWAY HEALTH AND** | } | |
| **REHABILITATION, LLC,** | } | |
| | } | |
| **Defendant.** | } | |

## MEMORANDUM OPINION

This case is before the court on defendant's Motion for Summary Judgment. (Doc. 16.)[1] Plaintiff claims that defendant, her former employer, discriminated against her based on her race and retaliated against her for asserting rights under the Family Medical Leave Act ("FMLA"). Upon consideration of the Motion, the supporting and opposing memoranda, arguments of counsel and the relevant law, the court finds, for the reasons stated below, that defendant's Motion is due to be granted.

## SUMMARY JUDGMENT STANDARD

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure ("the Federal Rules"), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine

---

[1]Reference to a document number, ("Doc. ___"), refers to the number assigned to each document as it is filed in the court's record.

1

issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Waddell v. Valley Forge Dental Associates, Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact and that it is therefore entitled to judgment as a matter of law. *See Celotex*, 477 U.S. at 323*; Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has met its burden, Rule 56(e) of the Federal Rules requires that the nonmoving party go beyond the pleadings and show that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *see also Celotex*, 477 U.S. at 324–25. "There is a genuine issue of material fact if the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor." *Waddell*, 276 F.3d at 1279; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Determining credibility, weighing evidence, and drawing legitimate inferences from the facts are all functions of the jury, *see id.* at 255; therefore, the court must accept as true all evidence favoring the nonmoving party and draw all justifiable inferences from the evidence in that party's favor. Nevertheless, the nonmoving party need not be given the benefit of every inference but only of every *reasonable* inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

2

## STATEMENT OF FACTS

Defendant hired plaintiff on June 12, 2005 as a Licensed Practical Nurse ["LPN"]. (Campbell Depo. (doc. 18-1) at 60:8-11, 85:20-22.) During her employment, plaintiff took FMLA leave twice, once beginning in June 2009 and once in September 2010. (*Id*. at 59:10-14; doc. 19 at 2-3.) On both occasions, plaintiff asked for "time off" and Northway's business office gave plaintiff an FMLA form to fill out. (Campbell Depo. at 137:1-18.)

On June 2, 2012, plaintiff and her sister were in the car, waiting at a stoplight, when they were hit from behind. (*Id*. at 112:5-17; doc. 14 at 3 ¶ 10.) Plaintiff broke her two front teeth and her shoulder and arm were swollen. (Campbell Depo. at 112:5-17.) Plaintiff was not scheduled to work June 3rd. (Doc. 19 at 5; doc. 14 at 3 ¶ 11.) Plaintiff called the nurse line each morning from June 4th to June 7th to report that she would be absent, and June 8th was her off day. (Doc. 19 at 5; Campbell Depo. at 122:17-22, 123: 6-7, 142:15-16.) On the voicemails, plaintiff "told [Sloan Phillips] about the accident and that [she] wouldn't be coming in, the doctor just wanted [her] to stay close and just move around slowly until . . . the pain and the swelling subsided some." (Campbell Depo. at 122:17-22.)

Phillips testified that she told plaintiff on June 5th "that if she was going to be off anymore, that she needed to file FMLA." (Phillips Depo. at 21:3-6.) Phillips is responsible for reporting FLMA-qualifying events. (*Id*. at 24:6-9.) There is some ambiguity as to what details Phillips told Freddy Skelton about plaintiff's absence. Phillips was asked "[D]id you ever tell anybody about the fact that you thought that Mary might need FMLA leave, other

3

than Mary, on the 5th?" She responded, "Freddy Skelton." (Phillips Depo. at 24:10-14.) However, Phillips subsequently stated that she did not remember what she said to Skelton other than that plaintiff would be off, did not remember if she mentioned the FMLA to Skelton, and did not understand what injuries plaintiff suffered in the car wreck. (Phillips Depo. at 24:15-25:10.) Skelton must sign off on every FMLA leave. (Skelton Depo (doc. 19) 25: 19-20.) Skelton knew about the car wreck after it occurred, but did not recall the details of it at his deposition. (*Id.* at 25:1-4.) On June 9th, plaintiff returned to work as scheduled, a doctor's note in hand excusing her for her days missed. (Doc. 14 at 3 ¶ 15; doc. 15 at 3 ¶ 15.) Plaintiff never completed FMLA forms regarding her absences, and defendant did not designate plaintiff's absences between June 4th and June 8th as FMLA leave. (*See* doc. 17 at 6 13; doc. 22 at 6; Campbell Depo. at 246:11-23.) Plaintiff worked June 9th, 10th, 12th and the morning of the 13th. (Campbell Depo. at 143:6-144:7; 146:22-147:6; 149:7-15.)

Plaintiff's broken teeth hurt. (Campbell Depo. at 157:12-158:15.) She took Tylenol on June 9th and 10th, but on the 13th, she switched to Lortab. (*Id*. at 159:7-160:2.) On the 12th, plaintiff called Warrior Dentistry to make a 12:30 appointment for the following day, June 13th, knowing that if she kept her appointment, someone would have to cover until 3:00 when her shift ended. (*Id*. at 143:3-5, 146:2-147:2, 161:18-22.) She was going to try to work through the pain and cancel her appointment, but the pain was too much and she decided she would keep the appointment after all. (*Id*. at 162:9-15, 187:21-188:12, 190:12-15.) On June 13th, plaintiff told Vaneese Cannon twice that she was going to a dentist appointment, once

at 10:00 a.m. and once just before she left. (*Id*. at 183:5-20.) Cannon is the R.N. Unit Supervisor, from whom plaintiff thought she needed permission to leave. (*Id*. at 177:2-6.) Cannon said, "Okay." (*Id*. at 178:21-23.) Plaintiff also visited Phillips's office at 10:00 a.m. and told Phillips that she had a dental appointment and that one of her colleagues had agreed to cover for her. As a Staff Development Nurse or "nurse manager," Phillips can give permission for LPNs to leave early, since she arranges who covers the carts. (Campbell Depo. at 177:10-14; Phillips Depo. at 6:3-6, 6:24-7:4.) According to plaintiff, Phillips was on the phone, but said "Okay, Mary Campbell." (Campbell Depo. at 184:22-185:6.) That is what Phillips calls plaintiff, Mary Campbell. (*Id*. at 182:19-20.) Phillips did not ask when Campbell first found out about her appointment. (*Id*. at 185:16-18.) Plaintiff clocked out at 11:43 a.m., en route to Warrior Dentistry. (Doc. 19 at 71.)

Phillips's and Cannon's testimonies read differently from plaintiff's. According to Cannon, plaintiff talked with her at 11:00 a.m. to inform her that plaintiff was leaving at 11:30 for a dentist appointment. (Cannon Depo. at 28:3-7.) Cannon did not feel that she had unilateral authority to allow LPNs to leave early.[2] (*Id*. at 80: 11-22.) This was not a problem on June 13th, however, because Cannon claims that plaintiff told her that plaintiff had already spoken with Phillips, which Cannon took to mean that plaintiff had permission. (*Id*. at 78:8-24, 92:14-93:1.) Cannon said, "Okay." (*Id*. at 92:1-2, 17-18.)

_____

[2]At her deposition, Cannon confirmed that, "according to the job description," she did have authority to grant permission unilaterally. (Cannon Depo. at 87:9-12.)

According to Phillips, plaintiff saw her twice on June 13th, once when Phillips clocked in, and once while making rounds. Plaintiff did not talk to her. (Phillips Depo. at 17:14-17.) Then, as plaintiff was leaving, she "peeked her head in the door and told [Phillips] . . . that she had counted her cart with [her colleague LaPaula Davis] and she was leaving; and she had gotten permission from [Cannon]." (Phillips Depo. at 8:20-24.)

Around seven o'clock the following morning, Freddy Skelton, defendant's administrator, called plaintiff and Cannon into his office. (Campbell Depo. at 164:8-17.) According to plaintiff, he said, "[Y]ou left the building yesterday without permission and I consider that neglect of duty and as of today you're terminated from Northway." (Campbell Depo. at 165:15-18.) When plaintiff asked for a copy of the papers Skelton had put before her, he told her no and slammed the door in her face. (*Id.* at 166:17-19.)

As administrator, Skelton had "managerial authority over every employee of [d]efendant." (Doc. 23-2 at 7.) He could discipline and fire employees, which he sometimes did in consultation with HR. (Skelton Depo. at 7:17-8:5.) Plaintiff's brief refers to Skelton as "[d]efendant's decisionmaker," (doc. 22 at 24, 27), and "the decision-maker," (*id*. at 8),[3]

---

[3]Plaintiff puts forth as a "disputed material fact" the following: "Skelton called Sabrina Bowling and Defendant's Regional Director Don Lewis. Skelton does not consult with Bowling and Lewis regarding the discipline of every employee. Bowling did not speak to Skelton until after Plaintiff's termination decision. Bowling stated she had no input into the termination decision." (Doc. 22 at 14.) Skelton testified to consulting with Bowling and Lewis in making the decision. (Skelton Depo. at 133:4-135:12.) Plaintiff never states her position in the conflict, if any. The court will assume that what actually happened is immaterial to plaintiff's argument, since plaintiff's brief only uses the

and defendant agrees: "Skelton [was] the sole decision maker who determined [p]laintiff's discipline for leaving the facility." (Doc. 17 at 11 ¶ 27.) When deciding whether to fire plaintiff, Skelton considered plaintiff's "past performance," (Skelton Depo. at 134:16), including her "previous conference reports," (*id*. at 134:19-20). (*See also id.* at 104:21-23, 88:2-4.) Skelton testified that plaintiff's conference reports written more than a year prior to her termination were "not necessarily" relevant. (*Id*. at 65:21, 67:10-11, 67:21-68:3.) Plaintiff had received two written warnings (one for unauthorized shift swapping and one for failing to record a medication on a patient's chart ("performance not up to standards")) and one verbal warning (for excessive tardiness) in the twelve months prior to her termination. (*Id*. at 68:4-16, 70:2-11, 71:13-23; doc. 18-1 at 104, 108, 110.) Each of these conference reports occurred within a five-day period in September 2011.

Skelton also went over "everything in the [three written] statements," (Skelton Depo. at 137:4-8; doc. 19 at 67-69), and "felt that [plaintiff] had significantly neglected her duties, and given her history," she should be terminated, (Skelton Depo. at 139:16-18). Phillips's written statement says, among other things, that plaintiff informed Phillips at 11:30 a.m. that she was leaving for the dental appointment, "at no point did I [Phillips] give Mary Campbell permission to count [the medicine] and leave the building," and that Campbell knew about the appointment the day before. (Doc. 19 at 69.) Cannon's statement says, among other

---

conflicting testimony as proof that "Bowling and Skelton can't keep their story straight." (Doc. 22 at 34.)

things, "I did not give her permission to pass the keys and leave. Stated it to me as if it were pre-approved so I said, 'O.K.'" (Doc. 19 at 68.) Skelton testified that "if [plaintiff] would have asked Ms. Cannon in a timely fashion, gave the facility an opportunity to cover her shift, there would not be any issue with her going to the dentist." (Skelton Depo. at 98:20-23.)

Plaintiff is white. She was one of very few white nurses at Northway. (Cannon Depo. at 67:14-18) ("Q: You say that most of the employees [at Northway] are black employees, correct? A: Oh, yes. Q: Overwhelming? A: Nintety-five – yes."). Defendant moved Kimberly Fuller, who is black, into plaintiff's position to replace her. (Self Depo. (doc. 23-4) at 72:13-16, 73:8-13; Cannon Depo. at 14:13-20.) In her Complaint, plaintiff asserts claims for race discrimination, in violation of Title VII and § 1981, and FMLA retaliation. (Doc. 14 at 4-7.)

## ANALYSIS

Because plaintiff has not presented evidence on which a reasonable jury could find that the reasons given by defendant for her termination were pretext for unlawful discrimination or retaliation, defendant is entitled to judgment as a matter of law on all of plaintiff's claims.

### A. FMLA Retaliation

"In order to establish a prima facie case of retaliatory discharge or retaliation using the *McDonnell Douglas* framework, a plaintiff must show that (1) she engaged in statutorily protected conduct; (2) she suffered an adverse employment action; and (3) there is a causal

connection between the protected conduct and the adverse employment action." *Brungart v. BellSouth Telecomm., Inc.*, 231 F.3d 791, 798 (11th Cir. 2000).

**1. Statutorily Protected Conduct**

Plaintiff gets sidetracked arguing that defendant violated specific sections of the statutes and regulations of the FMLA, which would be appropriate in an FMLA interference claim. (*See* doc. 22 at 20-24 (arguing how defendant violated FMLA notice requirements in 29 C.F.R. §§ 825.300(b)(1), (b)(2), (c)(1), 825.305(a), 825.303(b)).) The question in a retaliation claim, however, is whether the plaintiff engaged in statutorily protected conduct, not whether the defendant complied with statutory directives under the FMLA (other than the directive not to retaliate against employees asserting FMLA rights). To engage in such conduct, plaintiff must first be qualified for FMLA leave. *Pereda v. Brookdale Senior Living Cmty., Inc.*, 666 F.3d 1269, 1272 (11th Cir. 2012). Defendant does not argue that plaintiff's injuries from her car wreck did not actually amount to a "serious health condition" that would have qualified her leave for FMLA status.

Rather, defendant argues that because "plaintiff did not take or request FMLA leave for [her June 4 to June 8] absences . . . the leave plaintiff took during that time was not covered by the FMLA." (Doc. 17 at 15.) However, defendant acknowledges that notice, thus triggering protection from retaliation, of "the need for . . . FMLA leave does not [require the employee] to expressly assert rights under the Act or even mention the FMLA . . . though the employee would need to state a qualifying reason for the needed leave." (Doc. 17 at 16)

9

(quoting *Andrews v. CSX Transp., Inc.*, 737 F. Supp. 2d 1342, 1350-51 (M.D. Fla. 2010), in turn citing 29 C.F.R. § 825.208(a)(2)). Defendant claims that plaintiff's call-ins were not specific enough to "inform Northway that she was suffering from a *serious health condition* covered by the FMLA." (Doc. 17 at 17) (emphasis added). Apparently, defendant wanted plaintiff to explain enough so that Phillips could complete the checklist of elements of a "serious health condition" in 29 C.F.R. § 825.115(a)(1) or (a)(2). But that is not required by *Andrews* and *Lowery v. Strength*, 356 F. App'x 332, 333 (11th Cir. 2009), the case on which *Andrews* and defendant rely. *Lowery* requires that "[w]hen an employee's need for FMLA leave is unforeseeable, the employee need only provide [her] employer with notice sufficient to make the employer aware that [her] absence is due to a *potentially FMLA-qualifying reason*." *Lowery*, 356 F. App'x at 333 (quoting *Cruz v. Publix Super Markets, Inc.*, 428 F.3d 1379, 1382 (11th Cir. 2005)) (quotation marks omitted) (emphasis in original). In *Lowery*, informing the employer of leave needed for "medical reasons," including that the employee *had been* treated for depression and anxiety, was not enough. *Lowery*, 356 F. App'x at 334. In *Andrews*, "phoning in 'sick' or providing doctor's notes for unspecified ailments" was not either.  *Andrews*, 737 F. Supp. 2d at 1352. In this case, plaintiff claims that she "told [Phillips, via voicemail] about the [car] accident and that I wouldn't be coming in" pursuant to doctor's orders, until "the pain and the swelling subsided some." (Campbell Depo. at 122:17-22; *see also id.* at 121:17-18.) If an employee is out for "medical reasons" or because they are "sick," the employer does not have the first clue to separate that leave from the

universe of non-qualifying leave. Those reasons are distinguishable from plaintiff's, which was pain and treatment stemming from a specific, recent trauma: a car wreck. Therefore, for purposing of deciding the instant motion, the court will assume that plaintiff's calls put defendant on notice that her absences were potentially protected by the FMLA.

## 2. Causal Connection

Plaintiff was fired less than one week after returning from her FMLA-qualifying leave. Ordinarily, this temporal proximity is enough to create a presumption of a causal connection. *Hurlbert v. St. Mary's Health Care System, Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006). An employer can negate this presumption by presenting "unrebutted evidence that the decision maker did not have knowledge that the employee engaged in protected conduct." *Id.* (quoting *Brungart v. BellSouth Telecomm., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000)). Seeking to do so, defendant cites Skelton's testimony that he did not recall whether he was aware that Phillips mentioned the FMLA with regard to plaintiff's leave, and did not recall "being told the severity of an accident or the need for anything." (Doc. 17 at 19-20, quoting Skelton Depo. at 30:7-31:4.) "I don't recall" is not "affirmative evidence . . . that he was unaware" of plaintiff's protected activity, certainly not on summary judgment. (*See* doc. 17 at 20.) It is almost impossible to rebut "I don't recall." Phillips's statement to the effect that she told Skelton "about the fact that [she] thought that Mary might need FMLA leave," while ambiguous, is enough to ensure that defendant does not have the unrebutted evidence it

needs.[4] Defendant argues that Skelton did not know "details" about plaintiff's car wreck, (doc. 17 at 13), i.e., the "severity" of the accident, but Skelton did not need to know any more than the fact of and reason for her absence to put him on notice of plaintiff's statutorily protected activity. (*See* Skelton Depo. at 25:1-10.)

## 3. Pretext

Plaintiff has presented a prima facie case for FMLA retaliation. However, that is only the first step. "Unlike an interference claim, an employee bringing a retaliation claim faces the increased burden of showing that his employer's actions were motivated by an impermissible retaliatory or discriminatory animus." *Martin v. Brevard Cnty. Pub. Sch.*, 543 F.3d 1261, 1267-68 (11th Cir. 2008). Plaintiff has not met that burden for the same reasons that her claim for racial discrimination fails: she has not shown pretext.

## B. Racial Discrimination (Title VII and 42 U.S.C. § 1981)

"To establish a prima facie case of discriminatory discharge, the plaintiff must show that she (1) was a member of a protected class, (2) was qualified for the job, (3) suffered an adverse employment action, and (4) was replaced by someone outside the protected class." *Cuddeback v. Florida Bd. of Educ.*, 381 F.3d 1230, 1235 (11th Cir. 2004) (citing *Reeves v.*

---

[4]Of course, if this case went to trial, a jury might very well find that Skelton was not on notice of any protected activity by the plaintiff.

*Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)).[5] Missing *Cuddeback*, defendant does not argue that plaintiff cannot satisfy its prima facie case formula.

"Once a plaintiff has established a prima facie case of discrimination, the burden shifts to the employer to offer a nondiscriminatory legitimate reason for the adverse employment action." *Cuddeback*, 381 F.3d at 1236. Defendant argues that it has a legitimate non-discriminatory reason for firing plaintiff: she left work three hours before her shift ended without timely notice and without permission. That reason is sufficient to carry defendant's "exceedingly light" burden. *Turnes v. AmSouth Bank, NA*, 36 F.3d 1057, 1061 (11th Cir. 1994). "The burden then shifts back to the plaintiff to show that the employer's stated reason was a pretext for discrimination." *Cuddeback*, 381 F.3d at 1236.

Plaintiff argues that pretext is shown because the decisionmaker had no factual basis on which to assert that plaintiff "significant[ly] failed to perform duties as assigned" and because plaintiff reasonably could have believed that she had permission to leave.(Doc. 22 at 29-33.) But under Title VII and § 1981 (or the showing of pretext in FMLA retaliation), it does not matter much what *actually happened*. *See Alvarez v. Royal Atlantic Developers,*

---

[5]Defendant acknowledges *Cuddeback* in its reply brief, but insists that "the 11th Circuit has repeatedly required plaintiffs to show a similarly situated employee was treated more favorably" to establish a prima facie case. (Doc. 25 at 7.) It is an either/or situation. *Hudson v. Middle Flint Behavioral Healthcare*, 522 F. App'x 594, 596 (11th Cir. 2013) ("Rather than demonstrate that she was replaced by someone outside of her protected class, a plaintiff may instead demonstrate that her employer treated similarly situated employees outside of her class more favorably.").

13

*Inc.*, 610 F.3d 1253, 1266-67 (11th Cir. 2010) ("The inquiry into pretext centers on the employer's belief, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head."). What matters is what the employer *actually relied* upon. *IMPACT v. Firestone*, 893 F.2d 1189, 1194 (11th Cir. 1990); *Crawford v. Carroll*, 529 F.3d 961, 977 (11th Cir. 2008). As defendant put it in its reply brief, "[a]n employer is entitled to rely on its good-faith belief that the employee misbehaved in the workplace." (Doc. 25 at 4) (citing *E.E.O.C. v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1176 (11th Cir. 2000)). Skelton told plaintiff why she was being fired at her termination meeting: "[Y]ou left the building yesterday without permission and I consider that neglect of duty." (Campbell Depo. at 165:15-17.) Skelton testified that the "primary reason" that he fired her for leaving early was that "she did not give proper notice." (Skelton Depo. at 58:23-25; *see also* doc. 17 at 27.) Plaintiff's burden is to come forward with evidence "sufficient to permit a reasonable factfinder to conclude" that that reason—leaving the building early without permission and on short notice—was not what actually motivated defendant. *Combs v. Plantation Patterns,* 106 F.3d 1519, 1528 (11th Cir. 1997); *see also Burke-Fowler v. Orange Cnty.*, 447 F.3d 1319, 1323 (11th Cir. 2006) (describing plaintiff's burden as that of "prov[ing]" pretext).

While plaintiff may have believed that she had permission, and that belief may have even been reasonable, that fact does not result in a question of fact as to whether defendant's articulated reason for plaintiff's discharge was pretext for unlawful discrimination or

14

retaliation. There is no evidence before the court that the decisionmaker knew she had permission to leave.

As further argument of pretext, plaintiff points to persons she claims are "nearly identical" comparators who were treated more leniently than the plaintiff for the "same misconduct," (doc. 22 at 34). (*See id.* at 33-40.) A plaintiff can show pretext by proving that similarly situated employees who are not in plaintiff's protected group (here, nonwhites or non-FMLA takers) and who engaged in conduct "nearly identical" to hers were treated more favorably.[6] *See Rioux v. City of Atlanta*, 520 F.3d 1269, 1279-80 (11th Cir. 2008).

Deciding what is *nearly* identical—what is close enough—without simply requiring the conduct to be identical is, to say the least, "a focused inquiry." *See Silvera v. Orange Cnty. Sch. Bd.*, 244 F.3d 1253, 1258 (11th Cir. 2001). Cases finding that non-identical conduct was also not "nearly identical" are legion. Harder to find are the acceptable close calls. *Cf. McCann v. Tillman*, 526 F.3d 1370, 1374 n.4 (11th Cir. 2008) (noting, without

---

[6]That is enough. The court emphasizes this to dispel any notion that plaintiff, as a white person, could not be discriminated against by another white person unless he hated his own race. (*See, e.g.*, Campbell Depo. at 97:4-5 ("Q (Mr. Scroggins): Do you think he [Mr. Skelton] hates white people?"), 243:1-4 ("Mr. Scroggins: David—make sure this is on the record . . .  My question is, basically, very simply does she believe that Freddy Skelton harbors racial animus against his own race. That's a fair question . . . ."), 242:7-9 ("Q (Mr. Scroggins): Ms. Campbell, do you think Freddy has anything against white people?"), 238:13-16 (Q: I've got to ask you what in the world makes you think that a white male would discriminate against you on the basis of your race?"), 240:20-241:1 ("Q (Mr. Scroggins): What in the world do you think would be the motivation for Freddy to discriminate in that way, if any, or are you just out to retaliate against Freddy for some reason?").)

example, that "[a] range of comparators may satisfy this standard"). Three cases are instructive.

In *Lobeck v. City of Riveria Beach*, 976 F. Supp. 1460, 1462 (S.D. Fla. 1997), a plaintiff had "allegedly directed subordinate [police] officers to cover-up" the identity of an intoxicated arrestee who had been released and severely injured in a hit-and-run, then "lied to other police officers about the affair." Plaintiff's comparators were black officers who had escaped punishment for acts such as threatening bodily harm to a sergeant, beating people in custody, sexually and racially harassing other employees, and striking a supervisor. *Id*. at 1466. Operating under the conclusion that the conduct "need not be 'nearly identical' in form, but only 'nearly identical' in severity," the court could not say that these "very serious-sounding incidents" were "as a matter of law . . . less serious than a cover-up." *Id.* at 1466-67; *but see Bethel v. Porterfield*, 293 F. Supp. 2d 1307, 1321 (S.D. Ga. 2003) ("I disagree with Plaintiff's implication [from *Lobeck*] that the misconduct need only be nearly identical in severity, but not nearly so similar in form."), *aff'd*, 116 F. App'x 246 (11th Cir. 2004) (unpublished table decision).

In *Foster v. Thomas County*, 927 F. Supp. 2d 1350, 1353 (M.D. Ga. 2013), a hungry "E-911" call operator was seeking a stand-in so she could get dinner. She reached for her movie-watching co-worker's computer mouse, but met with his ("fist-swinging," she said, "startled," he said) arm. *Id.* She then grabbed at his headset and scratched his face in the process. *Id.* at 1353-54. "The Incident," as it would come to be called, culminated when he

either: asked her to not batter him again and they passionately argued (he said), or: came towards her with his fists clenched (she said). *Id.* at 1354. She was fired, he was not, and she sued. *Id.* The court found that the employer's attempt to distinguish the plaintiff's scratch from the co-worker's raised arm based on his arm-raising being unintentional was futile—"[t]he question of intent [was] exactly why this case was filed."[7] *Id.* at 1358-59. Their conduct was nearly identical.

In *McCaskill v. ConAgra Foods, Inc.*, 296 F. Supp. 2d 1311, 1315-16 (M.D. Ala. 2003), a plaintiff's romantic (if last-minute) Valentine's day gesture involving a brown-bagged bottle of gin and a store-bought card was foiled when a supervisor caught him attempting to bring the alcohol onto work premises. Plaintiff was fired. *Id.* at 1316. His comparator sold champagne gift baskets out of her car in the parking lot, advertising the deal with fliers, and was not punished. *Id.* at 1318. The court found the incidents nearly identical because both violations were intentional and occurred in plain sight, and the defendant could not offer other grounds to distinguish them. *Id.* at 1318-19.

With these success stories (and their exceptionality) in mind, the court turns to its focused inquiry. In it, defendant's characterization—"significant failure to perform duties

---

[7]This "nearly identical" comparison occurred in the prima facie case stage. It is unclear whether that court would have allowed the decisionmaker to simply rely on the supervisor's version of the facts, since the supervisor's potential bias was shown in the pretext stage, raising a "cat's paw" issue. *See id.* at 1359 ("The subjective intent of each employee during the Incident cannot be determined based on record review alone."); *id.* at 1361.

as assigned"—is not the focal point, and that is why it doesn't much matter. *See Floyd v. Fed. Exp. Corp.*, 423 F. App'x 924, 930 (11th Cir. 2011) ("[T]he mere fact that Bowers and Floyd were ultimately cited for violating the same provision of FedEx's People Manual does not make their conduct 'nearly identical.'"). The court is looking to see whether the conduct itself is nearly identical in quantity and quality to the comparators'. Plaintiff presents six comparators: Geralds, Simmons, Carroll, Peake, Washington, and Brown. (Doc. 22 at 34-39.) The first four can be analyzed together.

Geralds,[8] Simmons, Carroll, and Peake are four black certified nursing assistants who took a long lunch. (Doc. 25 at 11.) They did not clock out like they were supposed to do before going to lunch, and did not have permission to leave for so long. (Self Depo. at 44:9-18; doc. 23-6, 23-7, 23-8, 23-9; *but see* Skelton Depo. at 81:9-11 ("[Y]ou don't clock out for lunch or any other break on your eight-hour shift[.]").) Their failure to clock out suggested that they planned to avoid detection. (Doc 22 at 35-36; Self Depo. at 44:15-18; Skelton Depo. at 97:4-13.) Defendant acknowledged this dishonesty. (Skelton Depo. at 97:4-13.) Although the internal discipline forms say merely "over 1 hr.," the lunch lasted almost two hours. (Self Depo. at 50:16-19; doc. 23-6, doc. 23-7, doc. 23-8, doc. 23-9.) Upon returning to complete their shift, they finished their job duties for the day. (Self Depo. at 50:22-51:8.) Skelton suspended them for three days without pay and with a written warning. (*Id.* at 43:19-23.)

---

[8]In her deposition, Ms. Self and counsel apparently meant Avery Geralds when they referred to a "Mr. Avery." (Self Depo. at 36.)

Like plaintiff, they were charged under the category "significant failure to perform duties as assigned." (Skelton Depo. at 97:4-13.)

Obviously, the comparators' conduct is not identical to plaintiff's. Defendant argues that their conduct is also not "nearly identical" because the comparators, while failing to return from lunch *on time*, did eventually return to finish their shifts. (Doc. 25 at 12.) Plaintiff, on the other hand, left "on intentionally short notice and with zero intention to finish her shift." (*Id*.)

The comparators' conduct did not inflict that dose of harm. In leaving three hours and twenty minutes before her shift ended, plaintiff short-staffed the facility for the rest of the afternoon. Skelton testified that "[i]f she would have asked Ms. Cannon in a timely fashion, gave the facility an opportunity to cover her shift, there would not be any issue with her going to the dentist." (Skelton Depo. at 98:20-23.) Defendant had an ongoing problem: nurses attempting to pass off their duties onto someone else for a while "was an everyday thing." (Cannon Depo. at 35:34:24-35:7.) It put stress on the employees that were already doing their own jobs.[9] (*Id*. at 82:2-83:15.) Skelton was aware of this issue. (*Id*. at 83:19-23.)

Plaintiff also puts forth Frankie Washington as a comparator, but as defendant argues, she is distinguishable for one of the same reasons that the lunchers are: she came back. (Doc. 25 at 12.) Washington apparently improperly combined her meal break and her other daily

---

[9]Therefore, it does not matter that plaintiff had recruited a colleague to cover her duties.

break on some Sundays to take one long meal break to leave the facility to attend church. Like the four other comparators discussed above, Washington was away from the facility longer than she should have been because she did not have permission to combine breaks and stay away from the facility as long as she did. This conduct is different in character from the actions of plaintiff, who left the facility on short notice and did not return to complete her shift. Furthermore, defendant was apparently concerned with the implications of punishing an employee for going to church on Sunday. Self uses the phrase "reasonable accommodations," and "accommodated" twice, when referring to defendant's eventual treatment of Washington's "religious preferences." (Self Depo. at 54:5-6, 57:6-8); *see also* 29 C.F.R. § 1605.2(b)(1) ("Section 701(j) [of the Civil Rights Act] makes it an unlawful employment practice under section 703(a)(1) for an employer to fail to reasonably accommodate the religious practices of an employee . . . .").

Plaintiff's final comparator is Maurice Brown. Brown received a written warning on November 19, 2007 for "NC/NS," no call/no show. (Doc. 28-1 at 2; Skelton Depo. at 83.) He received a second written warning on April 23, 2008 that states: "did not fill out paper for swap shift, other emp[loyee] did not show, so NC/NS." (Doc. 28-1 at 3; Skelton Depo. at 83.) For his second no call/no show, he was placed on 90-day probation. These are his first two conference reports. The same illegible signature appears on both, and since Skelton began as defendant's administrator in July 2007, (Skelton Depo. at 6-7), and it is ambiguous from his deposition testimony whether he was aware of the incidents, (*see id.* at 83:2-17), the

20

court will assume that it is at least a disputed issue of fact.[10]

Missing a work day unannounced is probably nearly identical to leaving in the middle of a shift without permission when compared generally. They put defendant in the same position: understaffed. But this is a "focused inquiry," and in developing the specifics of this case, distinguishing factors make comparison inappropriate. Skelton could reasonably have decided not to terminate Brown for the November 19, 2007 no call/no show because it was his first offense. (*See id.* at 72:18-21.) Skelton could have decided not to terminate Brown for the April 23, 2008 no call/no show because he could reasonably have determined that Brown's only fault was failing to fill out the correct paperwork for swapping shifts,[11] and that Brown should not be faulted for the swapped employee's failure to show up. Additionally, Brown only had one previous conference report. When deciding what to do with Campbell, Skelton was looking at three conference reports in the last year, and statements from both of plaintiff's supervisors saying that they had not given her permission to leave[12] but that she

---

[10]The signature appears very similar to the one on Brown's conference report dated February 6, 2012, which is presumably Skelton's signature since it is the report terminating Brown's employment. (*See* doc. 28-1 at 16.) Skelton confirmed that the illegible signature followed by "NHA" (presumably, Northway Health Administrator) on Brown's February 2nd report is Skelton's. (Skelton Depo. at 86; *see* doc. 28-1 at 11.)

[11]One of Campbell's conference reports within the year of her termination was also for swapping without authorization, for which she was also given a written warning but not placed on probation. (Skelton Depo. at 71:13-23; doc. 18-1 at 108.)

[12]The court discussed above the evidence on this issue, including plaintiff's testimony that she believed she had permission to leave.

left anyway. *See Silvera v. Orange Cnty. School Bd.*, 244 F.3d 1253, 1259 (11th Cir. 2001) (explaining that disciplinary history distinguishes comparators).

Years later, Brown engaged in a series of misconduct beginning February 2, 2012 and ending February 6, 2012, when defendant fired him. (Doc. 23-10, doc. 23-11, doc. 23-12.) On February 2, 2012 he was placed on 90-day probation for "Type A #11. Refusing to get a res[ident] up after being asked by supervisor." (Doc. 23-10.) Skelton signed the disciplinary report. (Skelton Depo. at 86:2-5.) That conduct is not nearly identical to plaintiff's. Brown was again written up on February 4, 2012 for offenses including "left facility - twice," but Mary Campbell is the only supervisory signatory, (doc. 23-11), and although Skelton admits he knew of the February 4, 2012 incident, he testified that the February 4th report was "issued with the date of the 6th."[13] (Skelton Depo. at 127:1-3.) Even if "left facility - twice" was enough information to determine that his conduct was "nearly identical" to what plaintiff did, which it is not, Skelton would have to have known about it before February 6th and decided not to fire him. Brown was terminated on February 6, 2012 for "significant failure to perform duties as assigned," (doc. 23-12), the same category under which plaintiff was charged in the course of her termination.

---

[13]Although Skelton's wording is confusing, it seems that he meant that the conference report for Brown's February 4th misconduct either came into existence on the 6th, or was given to Skelton during Brown's February 6th termination meeting. Skelton says "[Campbell] wrote [the conference reports] and informed us about them, and we had to follow up." (Skelton Depo. at 127:18-20.)

In *Foster*, the plaintiff's and her comparator's conduct was not identical blow-for-blow, but the conduct occurred in the same altercation, and the court held that the defendant could not have (in unbiased honesty) determined that plaintiff's was intentional while her comparator's was not. In *McCaskill*, the plaintiff's and comparator's conduct was probably as close as possible to identity: the plaintiff was almost through the gate, intending to take alcohol on campus. The only difference was that his comparator actually made it through.

While this court would hesitate to say, as a matter of law, that taking a nearly two-hour lunch without clocking out is "less serious" than securing cover, clocking out, and leaving three hours early, time has not been kind to *Lobeck*'s explanation of the standard. *See Lobeck v. City of Riviera Beach*, 976 F. Supp. 1460, 1466-67 (S.D. Fla. 1997). The court in *Lobeck* relied on *Jones v. Gerwens*, 874 F.2d 1534 (11th Cir. 1989), to conclude that "comparable seriousness" places the inquiry on the severity of the conduct, not on other characteristics. *Lobeck*, 976 F. Supp. at 1466. There might have been some ambiguity about the standard at the time of *Lobeck*, but Eleventh Circuit cases since then have clarified it. Plaintiff's burden in proving pretext is to show similarity "in all relevant respects," *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004), to show "that the quantity and quality of the comparator's misconduct [was] nearly identical." *Burke-Fowler v. Orange Cnty.*, 447 F.3d 1319, 1323 (11th Cir. 2006) (quoting *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999)); *see also Rioux v. City of Atlanta*, 520 F.3d 1269, 1279-80 (11th Cir.

2008) (standard same in pretext stage); *McCann v. Tillman*, 526 F.3d 1370, 1374 n.4 (11th Cir. 2008), *cert. denied sub nom. McCann v. Cochran*, 555 U.S. 944 (2008).

The standard expressed in *Lobeck* would require the court to act as a chemist of morality or HR policy, taking two factually distinct events and distilling each's inherent "severity" for comparison. That is not the court's role. *See Wilson*, 376 F.3d at 1092.[14] It is much simpler: compare apples to apples. *Maniccia*, 171 F.3d at 1368-69. Plaintiff has not presented two apples for comparison in this case.

## CONCLUSION

Plaintiff has failed to show that defendant's proffered legitimate reason for terminating her is pretext. Because plaintiff has not carried her burden, defendant's Motion for Summary Judgment, (doc. 16), is due to be granted on both of plaintiff's claims. An order granting the Motion will be entered contemporaneously herewith.

**DONE** this 19th day of August, 2014.

Sharon Lovelace Blackburn
_____
SHARON LOVELACE BLACKBURN
UNITED STATES DISTRICT JUDGE

---

[14]In a truly remarkable case, perhaps the court could relax the standard to prevent something outrageous from escaping the law. *See McCann*, 526 F.3d at 1374 n.4 ("[T]here is the possibility that even in the absence of what may fairly be described as a nearly identical comparator, some conduct may be so unfairly discriminatory that no reasonable person would find it non-actionable. That is not the case here . . . .").